## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **CORNERSTONE MANAGEMENT** | ) | |
| **PARTNERS, INC.,** | ) | |
| | ) | **Case No. 19-20031-drd11** |
| | ) | |
| Debtor. | ) | |

## DISCLOSURE STATEMENT WITH RESPECT TO
## <u>JOINT CHAPTER 11 PLAN OF LIQUIDATION</u>

Brian Hockett          Mo. Bar No. 52984          Eric Peterson          Mo. Bar No. 62429
Mark Bossi          Mo. Bar No. 37008          Ryan Hardy          Mo. Bar No. 62926
**THOMPSON COBURN, LLP**          Scott Goldstein          Mo. Bar No. 28698
One U.S. Bank Plaza, Suite 2700          Zachary Fairlie          Mo. Bar No. 68057
St. Louis, MO  63101          Camber Jones          Mo. Bar No. 71026
Telephone: (314) 552-6000          **SPENCER FANE LLP**
mbossi@thompsoncoburn.com          1 N. Brentwood Boulevard
bhockett@thompsoncoburn.com          10th Floor
Saint Louis, MO 63105
**ATTORNEYS FOR THE OFFICIAL**          Telephone:  (314) 863-7733
**COMMITTEE OF UNSECURED CREDITORS**          Facsimile:  (314) 862-4656
epeterson@spencerfane.com
rhardy@spencerfane.com
sgoldstein@spencerfane.com
zfairlie@spencerfane.com
cjones@spencerfane.com

**ATTORNEYS FOR DEBTOR**

**Date: April 16, 2019**

## I.      INTRODUCTION AND DISCLAIMER

Debtor Cornerstone Management Partners, Inc. ("Debtor") and the Official Committee of Unsecured Creditors (the "Committee") submit their Joint Disclosure Statement (this "Disclosure Statement") to holders of Claims against and Interests in Debtor in connection with the solicitation of acceptances of the Joint Chapter 11 Plan of Liquidation (as the same may be amended from time to time, the "Plan"), a copy of which is attached as **Exhibit A**.  Unless otherwise defined, all capitalized terms contained herein have the respective meanings assigned to them in the Plan.

This Disclosure Statement describes certain aspects of the Plan, the Bankruptcy Case, Debtor's liquidation and wind-down and the formation of the Liquidating Trust.  Under the Plan, (a) Holders of Allowed Fee Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed General Unsecured Claims will be deemed to hold interests in the Liquidating Trust and (b) the Interests will be cancelled and terminated.  The Liquidating Trustee will be charged with:  (i) receiving and distributing to creditors holding Allowed Claims, in accordance with the Plan and the Liquidating Trust Agreement entered into with respect thereto, all funds deposited with the Liquidating Trust, (ii) pursuing any Remaining Actions on behalf of Creditors; and (ii) analyzing and reconciling Claims that have been filed against the Estate.  For a complete understanding of the Plan, you should read the Disclosure Statement, the Plan and the exhibits and schedules thereto, in their entireties.

Debtor and the Committee believe that confirmation of the Plan is in the best interests of all parties, including Creditors and the Estate.  Accordingly, Debtor and the Committee urge each Creditor that is impaired hereunder, and entitled to vote with respect to the Plan, to vote to accept the Plan.  To be counted, a ballot containing your vote to accept or to reject the Plan must be received by Debtor's counsel, at the address indicated on the ballot, by no later than 5:00 p.m. (Central Time) on June _____, 2019.

**NO REPRESENTATIONS CONCERNING DEBTOR OR THE PLAN ARE AUTHORIZED BY DEBTOR AND THE COMMITTEE OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN THE DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.  ANY NON-DEBTOR OR NON-COMMITTEE REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR DEBTOR OR THE COMMITTEE, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT.  DEBTOR AND THE COMMITTEE ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN TAKEN TO MAKE SURE IT FAIRLY REPRESENTS THE CURRENT POSITION OF DEBTOR.**

**FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE**

SL 3303294.1

Case 19-20031-drd11    Doc 94    Filed 04/16/19    Entered 04/16/19 09:30:56    Desc Main
Document      Page 3 of 25

PLAN ITSELF QUALIFIES ALL SUMMARIES.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE, AND ARE SUBJECT TO AND QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENTS.

SECTION 1125 OF THE BANKRUPTCY CODE REQUIRES THAT THERE BE A POST-PETITION DISCLOSURE IN THE FORM OF A DISCLOSURE STATEMENT THAT PROVIDES "ADEQUATE INFORMATION" TO CREDITORS BEFORE ANYONE MAY SOLICIT ACCEPTANCES OF A CHAPTER 11 PLAN.  THIS DISCLOSURE STATEMENT IS PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE SO AS TO PROVIDE "ADEQUATE INFORMATION" TO CREDITORS IN THIS PROCEEDING.  CREDITORS ARE URGED TO CONSULT WITH THEIR OWN INDIVIDUAL COUNSEL OR EACH OTHER AND TO REVIEW ALL OF THE RECORDS HEREIN IN ORDER TO FULLY UNDERSTAND THE DISCLOSURES MADE, ANY PLANS FILED HEREIN AND ANY OTHER PERTINENT INFORMATION IN THIS PROCEEDING.  ANY PLAN WILL BE COMPLEX, ESPECIALLY SINCE IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT, AND ANY INTELLIGENT JUDGMENT CONCERNING ANY PROPOSED PLAN CANNOT BE MADE WITHOUT FULLY UNDERSTANDING THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE FULL COMPLEXITIES OF ANY PLAN PROPOSED HEREIN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN.  EACH CREDITOR IS URGED TO STUDY THE PLAN IN FULL AND TO CONSULT ITS COUNSEL WITH RESPECT TO THE PLAN, ITS TAX IMPLICATION(S) AND ITS EFFECT ON HIS, HER OR ITS RIGHTS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

## II.      VOTING AND CONFIRMATION PROCEDURES

Under the Bankruptcy Code, classes of claims that are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the Plan. Classes of claims and interests that are not entitled to receive any distribution on account of their

3

claims or interests are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Under the terms of the Plan, the holders of Allowed Claims in Class 2 are entitled to vote to accept or reject the Plan.

Votes on the Plan are not being solicited from holders of Claims in Class 1, which are unimpaired and deemed to have accepted the Plan. Votes on the Plan are also not being solicited from holders of Interests. Holders of Interests in Class 3 will receive no distribution under the Plan and, therefore, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

## A.      Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Please carefully follow the instructions set forth in the ballot and vote and return your ballot(s), by first class mail, hand or overnight courier, to:

| If by First Class Mail to: | If by Overnight Courier or Personal Delivery: |
|---|---|
| Cornerstone Management Partners, Inc. c/o Eric Peterson Spencer Fane LLP 1 N. Brentwood Boulevard, 10th Floor Saint Louis, Missouri  63105 | Cornerstone Management Partners, Inc. c/o Eric Peterson Spencer Fane LLP 1 N. Brentwood Boulevard, 10th Floor Saint Louis, Missouri  63105 |

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M. (CENTRAL TIME) ON JUNE ___, 2019 (THE "VOTING DEADLINE").**

**ANY BALLOT WHICH IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED, WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.**

**ANY BALLOT THAT IS EITHER UNRETURNED BY THE VOTING DEADLINE OR IS RETURNED BUT NOT EXECUTED WILL BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the

SL 3303294.1

Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact counsel for Debtor or the Committee.

## B.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to determine whether the Plan meets the requirements for confirmation established by section 1129 of the Bankruptcy Code.  Any party-in-interest may object to confirmation of the Plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2019, at ____:00 ____.m.  Notice of the Confirmation Hearing has, or will be, provided to all holders of Claims and interests and other parties-in-interest (the "Confirmation Notice").

Objections, if any, to confirmation of the Plan must:  (i) be in writing; (ii) state the name and address of the objecting party and the nature of the Claim or interest of such party; (iii) state with particularity the basis and nature of any objection; and (iv) in accordance with Bankruptcy Rule 3020(b)(1), be filed, together with proof of service, with the Bankruptcy Court and served on the following parties so that they are received on _____, 2019 (the "Objection Deadline"), or such other date established by the Committee:  (a) counsel for Debtor, Eric Peterson, Spencer Fane LLP, 1 N. Brentwood Boulevard, Suite 1000, Saint Louis, MO 63105, epeterson@spencerfane.com; (b) counsel to the Committee, Brian Hockett, Thompson Coburn LLP, 505 N. 7th Street, Suite 3500, St. Louis, MO 63101, bhockett@thompsoncoburn.com; and (e) Office of the United States Trustee's Office, Adam Miller, Trial Attorney, 400 East 9th Street, Room 3440, Kansas City, Missouri, Adam.Miller@usdoj.gov.  **UNLESS AN OBJECTION TO PLAN CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## III.     GENERAL INFORMATION

## A.     Description and History of Debtor's Business

### 1.     Debtor's Business Operations

Historically, Debtor functioned primarily as a holding company.  Its two primary subsidiaries include or included Cornerstone National Insurance Company and Cornerstone Finance Company.  The origination and an overview of Debtor's history follows:

In the early 1990s, a company commonly referred to as General Accident Insurance acquired the business operations of a business commonly referred to as the Silvey Companies. The Silvey Companies owned insurance companies that operated collectively as a regional insurance carrier in Missouri, Arkansas, Kansas and Oklahoma.  The Silvey Companies were headquartered in Columbia, Missouri.  In 1996, its owner closed the Silvey Companies and transferred its insurance operations to offices in Kansas City and Saint Louis.

Seeing a market niche for a Columbia, Missouri based, agent-oriented, automobile insurance company following the exit of the Silvey Companies, James French founded Debtor as a holding company.  He also formed Cornerstone National Insurance Company ("CNI").  These firms were separate from the Silvey Companies and its owner, General Accident Insurance.

5

Debtor's largest operating subsidiary was CNI.  CNI is an insurance company formed under the laws of the State of Missouri and is subject to oversight and regulation by the Missouri Department of Insurance, Financial Institutions and Professional Registration (the "Department").

Debtor's second major subsidiary is Cornerstone Finance Company ("CFC").  CFC is a corporation formed and validly existing under the laws of the State of Missouri.  CFC's primary business is financing commercial insurance policy premiums.  Like the Silvey Companies' model before it, CFC also has historically financed mobile home purchases, and CFC continues to hold a number of promissory notes secured by mobile homes.  CFC has at this point filed a separate chapter 11 proceeding before the United States Bankruptcy Court for the Western District of Missouri.

Other indirect subsidiaries of Debtor exist or have existed in the past.  One such indirect subsidiary is an entity known as Cornerstone General Agency, Inc. ("CGA").  CGA is a corporation formed and validly existing under the laws of the State of Missouri. CGA is a wholly-owned by CFC and therefore only indirectly a subsidiary of Debtor.  CGA's primary business is insurance solicitation.  CGA manages agency appointment, solicits policy applications, and pays agency commissions on behalf of CNI, and not Debtor.  CGA also administers CNI's roadside assistance program.  It previously brokered policies for forms of insurance not offered by CNI and its agents as a convenience for CNI and its agents, but it no longer does so.  As set forth more fully below, following the sale of CNI during the within bankruptcy proceedings, CGA is in the process of winding down its operations.

Debtor's rights and obligations with respect to its subsidiaries and its historical operations are reflected, in large part, in a series of intercompany agreements including: (a) a cost allocation agreement between Debtor and CNI (the "CNI Cost Agreement"), (b) a tax allocation agreement between and among Debtor, CFC, CNI and others[1] (the "CNI Tax Agreement"), (c) a management and administrative support agreement between the Debtor and CFC (the "CFC Agreement"), and (d) a management and administrative support agreement between Debtor and CGA (the "CGA Agreement" and, together with the CNI Cost Agreement, the CNI Tax Agreement and the CFC Agreement, the "Intercompany Agreements").[2]

Under the CNI Cost Agreement, Debtor agreed to provide to CNI certain management services as more fully set forth in the CNI Cost Agreement.  In return, CNI agreed to pay to Debtor the direct costs incurred by Debtor in its performance of the services.  The Department reviewed the CNI Cost Agreement and issued notice dated February 4, 2009 that it did not disapprove of the CNI Cost Agreement.  The CNI Cost Agreement has been rejected by order of the Bankruptcy Court and terminated upon the sale of CNI during these bankruptcy proceedings.

Under the CNI Tax Agreement, CNI, CFC and others[3] agreed to pay to Debtor an amount of federal income tax based upon the amount of federal income tax CNI, CFC and others each would have paid if they filed federal tax returns separate from Debtor.  The Department reviewed the CNI Tax Agreement and issued notice dated October 10, 2006 that it did not disapprove of the

---

1 The "others" referenced here are former subsidiaries of Debtor.
2 The descriptions of the Intercompany Agreements provided in this Declaration are intended to be summaries only. The descriptions are qualified in their entirety by the terms of the Intercompany Agreements.
3 The "others" referenced here are former subsidiaries of Debtor.

6

CNI Tax Agreement.  CNI is no longer a participant in the CNI Tax Agreement.

Under the CFC Agreement, Debtor agreed to provide to CFC certain management services as more fully set forth in the CFC Agreement.  In return, CFC agreed to pay to Debtor the direct costs paid by Debtor on behalf of CFC, certain salaries and benefits of various Debtor employees, monthly rent of Nine Hundred Dollars ($900.00), two percent (2.0%) of certain of Debtor's overhead expenses, and a monthly fee of Two Thousand One Hundred Dollars ($2,100.00).

Under the CGA Agreement, Debtor agreed to provide to CGA certain management services as more fully set forth in the CGA Agreement.  In return, CGA agreed to pay to Debtor the direct costs paid by Debtor on behalf of CGA, certain salaries and benefits of various Debtor employees, monthly rent of Six Hundred Dollars ($600.00), one-and-one-half percent (1.5%) of certain of Debtor's overhead expenses, and a monthly fee of One Thousand Five Hundred Dollars ($1,500.00).

## 2.    Factors Precipitating Bankruptcy

Beginning around 2006, CNI began to market and sell automobile insurance products in the state of Florida.  CNI sustained significant losses in connection with this attempted expansion and ceased selling new policies in Florida in 2010.

In an effort to make up for the losses in Florida, CNI expanded its program business, pursuant to which it engaged managing general agents ("MGAs") outside of its core states who sold, underwrote, and administered claims under CNI policies in those markets. Initially this was successful, with CNI and Debtor showing profits for several years. However, deficiencies in MGA's claims handling processes resulted in very large claims for bad faith denial of coverage, resulting in large losses in 2011 and 2014.

Mr. French announced his retirement in 2014 and in August of that year, William Wheeler was made CEO of CNI.  Under his leadership, CNI attempted to expand its business outside its core markets of Missouri, Arkansas, Oklahoma and Kansas into Tennessee, South Carolina and Alabama. Under Mr. Wheeler's leadership CNI also shifted to promoting "non-preferred" automobile insurance products in those markets, which resulted in significant turnover in CNI's customer base.  Unfortunately, this strategy proved unsuccessful due to problems with the agent network in the new locations and the failure to sufficiently optimize pricing of the "non-preferred" products.

In addition, the automobile insurance industry as a whole entered a downturn in 2016: high employment, low gasoline prices and distracted driving claims increased the frequency and severity of automobile accidents among the general public.

CNI endeavored in 2016 to pare back its "non-preferred" business and to raise prices based on updated actuarial data.  These changes were not sufficient and financial results suffered.

On November 9, 2017, the Department instructed Debtor to be prepared to take action to ensure compliance with regulatory financial requirements with respect to risk based capital and strongly advised Debtor to take action to raise capital.

SL 3303294.1

By 2017, CNI was forced to exit the South Carolina market following significant losses arising from underpriced policies and CNI's inability to receive state regulatory approval to increase its rates.

### 3.    Overview of Debt Structure and Assets

Debtor initially was capitalized through the sale of common stock.  Debtor later issued and sold additional common stock, as well as six layers of preferred stock designated classes "A" through "F."  Today, Debtor has over 300 shareholders, including six separate classes of preferred shareholders in addition to the common stock shareholders.  No person or entity owns or controls more than 13.3% of the voting stock of Debtor.  Other than a single person who controls 13.3% of the voting stock of Debtor, no person or entity owns or controls more than 10% of the voting stock of Debtor.

Beginning in or around 2002, Debtor began borrowing money from investors to supplement its efforts to raise equity.  Generally speaking, Debtor would receive unsecured loans from individuals and entities evidenced by promissory notes (the "Notes").  As of the Petition Date, there were approximately 35 Noteholders and the debt outstanding and payable under the Notes totaled approximately $4.96 million (the "Note Balance").  The terms of the Notes vary and, consequently, the amount of monthly interest payments due fluctuates.  Aggregate interest payments typically ranged from about $30,000 to $35,000 per month

Some of the Notes have matured.  Historically, Note holders have "rolled" their Notes at or shortly before maturity.  Several significant holders, however, more recently declined to do so, exacerbating Debtor's lack of liquidity.

In addition to the Notes, Debtor received unsecured credit from CFC (the "CFC Loan").  The debt outstanding and payable on the CFC Loan as of the Petition Date stood at approximately $5.33 million.

Debtor has no secured debt.

Other than its ownership of its subsidiaries and cash on hand, Debtor owns certain furniture, fixtures and equipment such as computers and computer servers.  The same are the subject of a motion to sell which, if approved, will yield approximately $30,000 for Debtor.  Debtor has few other assets.  Debtor leases its office space and owns no real estate.

As of the Petition Date, CNI's capital and surplus position had declined to the point that upon the receipt of certain annual reportings on March 1, 2019, CNI's primary regulator, the Missouri Department of Insurance, Financial Institutions and Professional Registration, through its Division of Insurance Company Regulation (the "Insurance Department") would have had the statutory ability, and perhaps the obligation, to place CNI under administrative supervision pursuant to Mo. Rev. Stat. § 375.1160 and the risk-based capital ("RBC") rules governing insurance companies set forth in Mo. Rev. Stat. §§ 1250 through 1275.  Were such to occur, Creditor opportunities to recover on Claims would have been lost.

As a result of the above, Debtor commenced the Bankruptcy Case to protect Creditor opportunities to recover on their Claims, primarily through the sale of CNI before the Department

SL 3303294.1

might exercise its statutory rights to take over CNI's operations for the benefit of policy holders and consumers, and then distributing the sale proceeds under Bankruptcy Court supervision.

Debtor is otherwise unable to satisfy the Notes through other means in the timeframe available under Departmental oversight and applicable regulations governing RBC levels.

### 4.    Sale of CNI

Prior to commencing this case, Debtor undertook for several years to sell CNI or identify partners or investors in or to CNI.  There were however few interested prospective buyers, despite Debtor's diligent efforts to locate them.

Because CNI is an insurance company, the CNI Shares could not be sold or acquired without the prior approval of the Department.  Thus, any prospective purchaser of the CNI Shares would be required to file a so-called Form A Statement Regarding the Acquisition of Control of CNI (a "Form A") with the Department to obtain such approval.  The Form A filing requires extensive information regarding the proposed acquisition, the acquirer and its business, identity and background of the officers and directors of the acquirer, including biographical affidavits, third party background verifications and fingerprints, the nature, source and amount of consideration to be used to effect the acquisition, the future plans for the insurance company to be acquired, financial statements for the acquirer and other information.

Following several years of investigation, Debtor ultimately was able to identify a potential CNI buyer that was able to gain necessary Department approvals.  Debtor ultimately entered an agreement (as amended and restated, the "Sale Agreement") to sell all the equity interests of CNI (the "CNI Shares") to CFM Insurance, Inc. (the "Buyer").  In addition to cash paid at closing to Debtor, the Buyer assumed certain debt obligations (of approximately $5 million) and was required by the Department to make capital contributions of approximately $3 million to CNI.  The total Buyer's outlay was thus approximately $13.34 million.

The Department approved the Sale Agreement on January 4, 2009.

The Bankruptcy Case commenced by Debtor's filing of a voluntary petition under chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") on January 15, 2019.  A motion to approve the Sale Agreement was filed that same day.

The Court granted interim approval of aspects of the Sale Agreement on January 17, 2019.

On February 21, 2019, the Court gave final approval the Sale Agreement.  No Creditors or parties in interest objected to the Court's approval of the Sale Agreement.

On February 27, 2019, just one day before Departmental supervision and control over CNI might have otherwise occurred, the sale was able to close.  On that date, the Buyer paid the purchase price as ordered by the Court and infused CNI with $3 million in capital as required by the Department.

Had the sale failed to close, the Insurance Department would likely have placed CNI into supervision or receivership on March 1, 2019 since CNI's RBC, without the Buyer's capital

SL 3303294.1

infusion, would been well below required levels.  Approval of the Sale Agreement thus maximized the value of the CNI Shares for the benefit of Creditors.

## IV.    THE CHAPTER 11 CASE[4]

As a consequence of Debtor's commencement of the Bankruptcy Case, all actions and proceedings against Debtor and all acts to obtain property from Debtor were stayed under section 362 of the Bankruptcy Code.

## A.    Relevant Chapter 11 Filings

1.    **First-Day Motions.**  In an effort to minimize the impact of the commencement of the Bankruptcy Case on Debtor's operations and to facilitate the administration of the Bankruptcy Case, Debtor filed various motions and applications on the first day of the Bankruptcy Case.  These "first-day motions" requested relief that is typical for complex Chapter 11 cases, including, motions to continue utility service, employ counsel, approve compensation procedures, maintain insurance, and other matters.

2.    **Retention of Professionals.**  Debtor filed applications requesting approval by the Bankruptcy Court of its retention of various professional firms they have been utilizing throughout the Bankruptcy Case, including:  (i) Spencer Fane LLP, as bankruptcy counsel; and (ii) Williams Keepers as accounting advisors.  The Bankruptcy Court entered orders approving the retention of these professionals.

3.    **Schedules and Statements.**  Debtor filed its Schedules on the Petition Date and its Statement of Financial Affairs on January 29, 2019 (as may have been amended from time to time, the "Schedules and Statements").  The meeting of creditors under section 341(a) of the Bankruptcy Code was held on February 20, 2019 in Jefferson City, Missouri, at which representatives of Debtor were questioned by Creditors, Creditors' representatives and a representative from the Office of the United States Trustee.  Creditors are expressly referred to the Schedules and Statements, which are on file in these proceedings, for the purpose of becoming fully informed as to the assets, liabilities and financial affairs of Debtor as of the Petition Date.

4.    **Sale of CNI.**

As set forth more fully above, on January 15, 2019 Debtor filed its Motion to Approve the Sale Agreement Free and Clear of All Liens, Interests, Claims and Encumbrances Pursuant to 11 U.S.C. § 363 (the "Sale Motion").

On February 21, 2019, the Bankruptcy Court entered its Order approving the Sale Agreement (the "Sale Order").

---

[4]Section IV of the Disclosure Statement is only a summary of the Chapter 11 Case.  For a full list of motions and pleadings filed, Debtor and the Committee refer parties-in-interest to the docket of the Chapter 11 Case, which can be accessed through the Bankruptcy Court's PACER system (account required) at ecf.mowb.uscourts.gov or from Debtor's attorneys.

SL 3303294.1

Pursuant to the Sale Order, the Buyer was approved as the purchaser of the CNI Shares under the Sale Agreement.

**B.      Committee Participation in the Chapter 11 Case**

Pursuant to section 1102(a) of the Bankruptcy Code, on February 12, 2019, the U.S. Trustee appointed the Committee, which is comprised of the following Creditors—Jan G. Merry, Peter K. Buchert, and Christopher S. Sutherland.

Since the appointment of the Committee, the Committee has taken an active role in the Bankruptcy Case. Consistent with its duties under section 1103 of the Bankruptcy Code, the Committee:  (i) consulted with Debtor on the administration of the Bankruptcy Case; (ii) investigated the acts, conduct, assets, liabilities and financial condition of Debtor, the operation of its business and matters relevant to the Bankruptcy Case; (iii) reviewed and ultimately endorsed the Sale Agreement after negotiating with third-parties for enhancements to Creditor recoveries, and (iii) participated in drafting and formulating the Plan and the Disclosure Statement.

## V.      FINANCIAL INFORMATION

**A.      Assets**

The following assets will be transferred to the Liquidating Trust on or before the Effective Date. The assets are described in Section 2.43 of the Plan as follows:

"Liquidating Trust Assets" shall mean all assets and Property of Debtor transferred to the Liquidating Trust pursuant to the Plan and the Liquidating Trust Agreement, including, but not limited to, Cash, Accounts, the Debtor's equity interest in CFC, the Avoidance Actions, the Remaining Actions, and all claims and causes of action asserted by the Committee. Liquidating Trust Assets shall exclude all assets or property of CNI which has been transferred to the Buyer. The Liquidating Trust Assets shall specifically exclude the Wind-Down Carve-Out and the Committee Carve-Out (as described in the Sale Order).

The assets generally consist of the following:

**1.      Interests.** The term Interests shall include ownership, whether direct or indirect, of Debtor's remaining non-CNI subsidiaries including, without limitation, CFC. Interests will be transferred to the Liquidating Trust for disposition pursuant to its terms as and when available.

**2.      Remaining Actions.** The Remaining Actions are defined under the Plan as:

Any and all non-released claims or causes of action of Debtor and the Estate as of the Effective Date, whether arising under any contract, tort, the Bankruptcy Code, or other federal or state law, specifically including all adversary proceedings and lawsuits, together with all products and proceeds thereof.

**a.      Avoidance Actions.** The Liquidating Trustee may be able to pursue Avoidance Actions against recipients of preferential transfers made in the 90 days prior to

11

the commencement of the Bankruptcy Case under section 547(b) of the Bankruptcy Code. The Schedules and Statements indicate that Debtor made transfers to non-insider Creditors in the 90 days prior to the Petition Date, certain of which may be recoverable as preferential and/or fraudulent transfers.

      **b.**     **Other Claims.**  The Liquidating Trustee may be able to assert other claims belonging to Debtor and its Estate, upon completion of any investigations as may be necessary and appropriate.  Such claims would include, without limitation, claims for breach of contract, tort, claims under the Bankruptcy Code, or under other federal or state law.

      **3.**     **Other Assets**.  In addition to the assets described above, Debtor may also have other assets.  The same shall be the property of the Liquidating Trust as and when discovered, unless specifically excluded by the Liquidating Trust.

      **4.**     **The Administrative Carve-Out and the U.S. Trustee Carve-Out.**  An Administrative Carve-Out in an amount determined by the Liquidating Trust shall be retained by the Liquidating Trustee for the payment of administrative expenses or Creditors of the estate.  An additional amount shall be retained, as necessary, for the payment of fees to owing to the U.S. Trustee.

**B.**    **Liabilities**

      **1.**     **Administrative Claims.**  Administrative Claims include claims incurred in the operation of Debtor during the course of the Bankruptcy Case and include Fee Claims.  Debtor's Professionals and Committee's Professionals estimate that as of the Confirmation Date the Fee Claims will be in the approximate amount of $50,000.

      **2.**     **Priority Tax Claims.**  The Internal Revenue Service has filed a claim $14,211.24, of which it asserts is entitled to priority treatment.   Debtor's schedules reflect additionally a priority tax claim of $3,445.42 in favor of the Boone County Collector.  If it is determined that such claims exist upon consultation with taxing authorities, the same will be paid in full.

      **3.**     **Non-Tax Priority Claims.**  There are no non-Tax Priority Claims against Debtor reflected in Debtor's Schedules.  No non-Tax Priority Claims have been filed by Creditors.

SL 3303294.1

**4.      General Unsecured Claims**.  Subject to the filing of additional proofs of claim prior to the Bar Date, General Unsecured Claims in Class 2 total approximately $10,430,184.58, based upon the Schedules and Statements and the proofs of claim filed.

**5.      Classes 3 Interests (Common and Preferred Stock).**  Interests in Class 3 consist of any legal or equitable interest in Debtor, including any ownership interest or right to acquire any ownership interest Debtor.

## VI.      PLAN OF LIQUIDATION

### A.      Objectives of the Plan

The primary objectives of the Plan are to:  (i) transfer the Liquidating Trust Assets to the Liquidating Trust, which will be charged with liquidating them, reconciling Claims, prosecuting Avoidance Actions and other Remaining Actions for the benefit of Creditors and making distributions to Creditors and (ii) maximize value to all Creditor groups on a fair and equitable basis under the priorities established by the Bankruptcy Code and applicable law.

Debtor and the Committee believe that the Plan provides holders of Allowed Claims with a substantially greater recovery than the recovery they would receive without approval of the Plan, or upon conversion of the Bankruptcy Case to a liquidation under Chapter 7.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in Debtor, and will be binding upon all holders of Claims against and Interests in Debtor upon the Confirmation Date.  In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative documents, including, without limitation, the Liquidating Trust Agreement, are controlling.

### B.      Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its interest holders.  Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

In addition, Chapter 11 may be used to effectuate an orderly liquidation of a debtor's business and assets.  In contrast to a Chapter 7 liquidation, in which a trustee is appointed to

conduct the liquidation and wind down of the estate, in a Chapter 11 liquidation, a debtor or its designee (such as the Liquidating Trustee) remains in possession of the estate.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code contemplates that a debtor, through its pre-bankruptcy management, will continue to operate its business in the ordinary course and remain in possession of its property during the case and while it seeks to negotiate and implement a plan. Any activities that are not within the ordinary course of a debtor's business must be approved by the bankruptcy court before they are undertaken.

The consummation of a plan is the principal objective of a Chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any person or entity acquiring property under the plan and any creditor of or equity security holder in a debtor, whether or not such creditor or equity security holder: (i) is impaired under or has accepted the plan; or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes them for the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

## C.      Means of Implementation of the Plan

**1.      Vesting of Assets.** On the Effective Date, the Liquidating Trust Assets will be transferred to and vest in the Liquidating Trust and be deemed contributed thereto, subject to the terms of the Plan and Confirmation Order. All property held in the Liquidating Trust for distribution pursuant to the Plan will be held solely in trust for Creditors and will not be deemed property of Debtor. Upon entry of the Confirmation Order, Debtor will be authorized and directed to take such steps as may be necessary or appropriate to confirm such transfer and contribution of the Liquidating Trust Assets to the Liquidating Trust, subject to oversight from the Liquidating Trustee and the Liquidating Trust Advisory Board, as applicable.

**2.      Cancellation of Interests.** On the Effective Date, all of the Interests will be deemed cancelled and of no further force, whether surrendered or not.

**3.      Liquidating Trust Asset Administration.** The Liquidating Trustee, with oversight from the Liquidating Trust Advisory Board, will administer the Liquidating Trust Assets pursuant to the Plan, the Confirmation Order, and the Liquidating Trust Agreement from and after the Effective Date. To the extent they conflict, the Plan and Confirmation Order will control over the Liquidating Trust Agreement, and the Confirmation Order will control over the Plan.

**4.      Termination of Committee.** The Committee will terminate automatically upon the Effective Date. Upon termination of the Committee, the Committee will be dissolved and its members shall be deemed released of their duties and responsibilities in connection with the Bankruptcy Case or the Plan and its implementation, and the retention or employment of the Committee's counsel will terminate, except for ministerial duties or any duties imposed pursuant

14

to the Plan (including, without limitation, filing applications for allowance and payment of Fee Claims).

5.    **Case Administration.**  From and after the Effective Date and continuing through the date that a final decree closing the Bankruptcy Case is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Liquidating Trustee will possess the rights of Debtor for all matters arising in, arising under or related to the Bankruptcy Case as set forth in the Plan.  In addition to, and without limiting the generality of the foregoing, for all matters arising in, arising under or related to the Bankruptcy Case, the Liquidating Trustee will:  (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction; (ii) have the right to obtain records of, or related to, Debtor (including, without limitation, bank statements and cancelled checks); (iii) be entitled to notice and opportunity for hearing; (iv) be entitled to participate in all matters brought before the Bankruptcy Court, including, but not limited to, adversary proceedings; (v) have exclusive standing to commence Avoidance Actions and other Remaining Actions; (vi) be entitled to request the Bankruptcy Court to enter a final decree closing the Bankruptcy Case; and (vii) be entitled to receive notice of all applications, motions and other papers and pleadings set before the Bankruptcy Court in the Bankruptcy Case.

6.    **Liquidating Trust Advisory Board.**  For purposes of implementation of the Plan, the Liquidating Trust Advisory Board shall be created on the Confirmation Date and shall be comprised of three (3) members selected by the Committee.  Members of the Committee are not prohibited from serving on the Liquidating Trust Advisory Board subject to being otherwise acceptable as provided in the Plan.  The Liquidating Trust Advisory Board shall exercise such rights and duties as are set forth in the Liquidating Trust Agreement.  Each member of the Liquidating Trust Advisory Board shall serve until the earlier of: (i) his or her death or resignation; (ii) his or her removal pursuant to the Liquidating Trust Agreement; and (iii) the termination of the Liquidating Trust.  Liquidating Trust Advisory Board members shall not be compensated, but are entitled to have their reasonable expenses reimbursed by the Liquidating Trust.

7.    **Trust Professionals.**  Upon the Effective Date, the Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators or other Professionals as it may deem necessary upon approval of the Liquidating Trust Advisory Board and in accordance with the Liquidating Trust Agreement without approval of employment or fees by the Bankruptcy Court.  The Professionals retained by the Liquidating Trustee are not required to be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, counsel and financial advisors of any party in the Bankruptcy Case.  The Liquidating Trustee's retention of any such Professionals is deemed not to pose any conflict of interest, and no conflict will exist by virtue of the filing of applications by Professionals for allowance of Administrative Claims in accordance the Plan.

8.    **Term of Bankruptcy Injunction or Stays.**  Except as otherwise provided in the Plan and Confirmation Order, all injunctions or stays provided for in the Bankruptcy Case under

15

sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Bankruptcy Case is closed.

**9.** **Exculpation and Limitation of Liability.** Neither the Committee, Debtor, the Liquidating Trust, nor any of their respective members, officers, directors, shareholders, employees, advisors, attorneys or agents or representatives acting in such capacity, will have or incur any liability to, or be subject to any right of action by, any Person or Entity, for any act or omission in connection with, relating to or arising out of, the Bankruptcy Case or the pursuit of confirmation of the Plan for actions taken during the Bankruptcy Case, except to the extent arising out of fraud, or willful misconduct, and in all respects will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.  For the avoidance of doubt, nothing contained in the Plan or Liquidating Trust Agreement shall be deemed a release or waiver of any Claims, Remaining Actions, or Avoidance Actions Debtor or the Estate may hold against Debtor's directors, officers, employees, insiders, or affiliates.

**10.** **Quarterly Reports.**  The Liquidating Trustee will prepare and provide the Liquidating Trust Advisory Board with quarterly reports within 30 days after the conclusion of every calendar quarter setting forth:  (i) all distributions to Creditors during the calendar quarter; (ii) a summary of the Liquidating Trust deposits and disbursements during the calendar quarter; and (iii) a summary of the Liquidating Trust Assets.  As used in this section, "calendar quarter" will mean a three month period of time, and the first calendar quarter will commence on the first day of the first month immediately following the occurrence of the Effective Date.

## VII.   STATUS AND EXISTENCE OF
## EXECUTORY CONTRACTS AND OTHER LITIGATION

**A.** **Executory Contracts**

**1.** **Contracts Deemed Rejected.**  All executory contracts or unexpired leases of Debtor that: (i) have not been assumed and assigned as of the Effective Date; or (ii) have not expired by their own terms; will be deemed rejected pursuant to section 365 of the Bankruptcy Code on the Confirmation Date.

**2.** **Deadline to Object to Rejection.**  If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to confirmation of the Plan.

**3.** **Bar Date for Rejection Damages.**  All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must, notwithstanding any other order of the Bankruptcy Court that may provide for a different date, be filed with the Bankruptcy Court no later than 30 days after the Effective Date.  The Claims of any Person arising from the rejection of executory contracts or unexpired leases that fails to timely file a proof of

SL 3303294.1

claim will be discharged under Section 1141(d) of the Bankruptcy Code and forever barred from assertion against Debtor, the Liquidating Trust, or their respective assets or Estate.

## B.    Litigation

**1.    Potential Avoidance Action Litigation.**  As previously set forth herein, the Schedules and Statements indicate Debtor made certain transfers to non-insiders, including Creditors, trade vendors, and others, in the 90 days prior to the Petition Date and also made transfers to insiders in the one (1) year prior to the Petition Date, certain of which may be recoverable (the "Preferential Transfers").

As of the Effective Date, the Liquidating Trustee will assume responsibility for any Remaining Actions (including Avoidance Actions).  The Liquidating Trustee will also be authorized to analyze and, if appropriate, file adversary proceedings under, *inter alia*, sections 544, 547, 548, 549 and 550 of the Bankruptcy Code to avoid and recover transfers.

These potential claims are not exhaustive.  On behalf of Debtor and the Estate, rights to any Remaining Action that may be identified after the Effective Date shall be preserved for the Liquidating Trustee.

**2.    Possible Unknown Claims.**  The Liquidating Trustee may have additional Remaining Actions (including Avoidance Actions) against third parties that are unknown at this time.  The Liquidating Trustee will be empowered to investigate and evaluate any potential additional litigation claims.

The recoveries, if any, from any litigation brought by the Liquidating Trustee will depend on many factors, which cannot be predicted at this time.  The Liquidating Trustee may, upon approval of the Liquidating Trust Advisory Board, elect not to pursue certain Remaining Actions (including Avoidance Actions) the pursuit of which the Liquidating Trustee deems not to be in the best interest of the Estate or the Liquidating Trust.

Except as specifically provided herein or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, claims or Remaining Actions (including Avoidance Actions) that the Liquidating Trustee may choose to assert on behalf of the Estate or the Liquidating Trust in accordance with any provision of the Bankruptcy Code or any non-bankruptcy law.

All Remaining Actions shall survive confirmation, and the commencement of prosecution of Remaining Actions shall not be barred or limited by *res judicata* or estoppel, whether judicial, equitable or otherwise, based upon confirmation of the Plan.  The Liquidating Trustee's right to commence and prosecute Remaining Actions (including Avoidance Actions) shall not be abridged or materially altered in any manner by reason of confirmation of the Plan.

## C.    Objections to Claims

Debtor and the Committee believe that objections to certain Claims may be warranted, and from and after the Effective Date, the Liquidating Trustee will have authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims.  The Liquidating Trustee will

SL 3303294.1

have standing to file objections to such Claims even if such Claims were scheduled by Debtor as undisputed, liquidated and non-contingent.  The Liquidating Trustee must file objections to such Claims by no later than 180 days after the Effective Date (unless extended by an order of the Bankruptcy Court); provided, however, that the Liquidating Trustee may file objections to such Claims within 90 days of the filing of any amended Claim.

If the Liquidating Trustee objects to a Claim, payment will be withheld only with respect to the amount actually in dispute, and such objection will not affect payments or distributions under the Plan on the undisputed portion of the Claim, if any.

## VIII.   CONFIRMATION AND CONSUMMATION PROCEDURE

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the requirements of Chapter 11, including, among other things, that:  (i) the Plan has properly classified Claims and Interests; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) Debtor and the Committee have complied with applicable provisions of the Bankruptcy Code; (iv) Debtor and the Committee have proposed the Plan in good faith and not by any means forbidden by law; (v) the Plan has been accepted by the requisite votes of all Classes of Creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is in the "best interests" of all holders of Claims or interests in an Impaired Class; (vii) the Plan is "feasible" in that confirmation of the Plan is not likely to be followed by the liquidation or need for further restructuring of Debtor, unless the Plan contemplates liquidation; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Confirmation Date.

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

## A.     Solicitation of Votes

Under the Bankruptcy Code, only classes of claims and interests that are impaired under the plan are entitled to vote to accept or reject a plan.  A class is impaired if the legal, equitable or contractual rights to which the holders of claims or interests are entitled are modified, other than by curing defaults and reinstating the debt.  Under sections 1126(f) and (g) of the Bankruptcy Code, classes of claims and interests that are not impaired are conclusively presumed to have accepted the plan and are not entitled to vote on a plan, and classes of claims and interests whose holders will receive or retain no property under the plan are deemed to have rejected a plan and are not entitled to vote on a plan.  Creditors who hold disputed or disallowed claims are not entitled to vote to accept or reject the plan.

Under the Plan, the holders of Allowed Claims in Class 2 are entitled to vote to accept or reject the Plan.  All other Classes of Claims or Interests are deemed under the Bankruptcy Code to

18

have accepted or rejected the Plan.  This Disclosure Statement and an appropriate ballot are being distributed to all holders of Claims who are entitled to vote on the Plan.

Under the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims properly voted in that class, voted to accept.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any ballot that is properly completed, executed and timely returned but does not indicate an acceptance or rejection of the Plan, or indicates both an acceptance and a rejection of the Plan, will be deemed to be a vote to accept the Plan.  Whenever a Creditor casts more than one ballot voting the same Claim before the Voting Deadline, the last ballot received before the Voting Deadline is deemed to reflect the voter's intent and will therefore supersede any prior ballots. Creditors must vote all of their Claims within a particular Class under the Plan either to accept or reject the Plan and may not split their vote, and thus a ballot that partially accepts and partially rejects the Plan will not be counted.

## B.      The Confirmation Hearing

The Confirmation Hearing is scheduled for _____, 2019 at ___:00 p.m. before the Bankruptcy Court at _____, Jefferson City, Missouri 64106.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of section 1129 of the Bankruptcy Code.  Prior to the Confirmation Hearing, Debtor will submit a report to the Bankruptcy Court reflecting the votes received with respect to the acceptance or rejection of the Plan by the parties entitled to vote thereon.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.  Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on all required parties on or before the Objection Deadline, which is the confirmation objection deadline that has been set by the Bankruptcy Court. Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

## C.      Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan:  (i) has been accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best

SL 3303294.1

interests" of creditors and stockholders that are impaired under the plan and that vote, or are deemed, to reject the plan.

**1.      Unfair Discrimination and Fair and Equitable Tests**

To obtain confirmation of a plan over the objection of a class of claims or interests that rejects such plan, it must be demonstrated that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such non-accepting class. In order for a plan to be found to be "fair and equitable" and thus subject to confirmation by "cramdown" under section 1129(b) of the Bankruptcy Code, Debtor and the Committee must demonstrate:

> **a.      For a Class of Unsecured Creditors:** That either: (i) each impaired unsecured creditor receives or retains, under the plan, property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

> **b.      For a Class of Interests:** That either: (i) each holder of an interest will receive or retain, under the plan, property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

As described above, holders of Interests in Class 3 are presumed, under section 1126(g) of the Bankruptcy Code, to have rejected the Plan. Debtor and the Committee request confirmation of the Plan under section 1129(b) of the Bankruptcy Code, notwithstanding the deemed rejection of the Plan by Class 3. Debtor and the Committee believe that the Plan may be confirmed pursuant to the above-described "cramdown" provisions over the dissent of Class 3 in view of the terms of the Plan. Debtor and the Committee believe that the treatment under the Plan of the holders of Interests in Class 3 satisfies the "fair and equitable" test because there are no Classes junior to such non-accepting Classes that will receive or retain any property under the Plan and since Class 2, whose Claims have priority over the Interests classified in Class 3 to the extent Allowed, are not being paid in full under the terms of the Plan and further will share Pro Rata in the Liquidating Trust Assets. In addition, Debtor and the Committee do not believe that the Plan unfairly discriminates against Class 3.

**2.      Best Interests Test**

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Debtor and the Committee believe that Holders of Impaired Claims and interests in each Impaired Class under the Plan would receive significantly less under a Chapter 7 liquidation than under the Plan.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such debtor's assets in a liquidation under

SL 3303294.1

Chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Liquidating Trust Assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the bankruptcy case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as that of counsel and other professionals retained by the trustee, asset disposition expenses and all unpaid expenses incurred until the liquidation is completed.

Debtor and the Committee believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. Debtor and the Committee believe that the members of each Impaired Class will receive significantly greater value under the Plan than they would in a Chapter 7 liquidation proceeding due to: (i) the value the Liquidating Trustee will bring to the Estate in reconciling overstated and invalid Claims and from Avoidance Actions and other Remaining Actions; and (ii) avoiding the additional expenses, delays, and ongoing court and litigation costs associated with conversion to a Chapter 7 case that would unnecessarily erode Creditor recoveries.

With respect to item (i) above, although it is possible that a Chapter 7 trustee will pursue objections to Claims and Avoidance Actions and other Remaining Actions, Debtor and the Committee submit this is highly speculative because the pursuit of such litigation is not a precondition to the appointment of a Chapter 7 trustee, and the Chapter 7 trustee may ultimately choose not to challenge Claims or to pursue Avoidance Actions and other Remaining Actions.

With respect to item (ii) above, Debtor and the Committee submit that a significant distinction between the Plan and converting the Bankruptcy Case to Chapter 7 is the substantial Chapter 7 administrative costs that will result from such conversion. Pursuant to section 326 of the Bankruptcy Code, the statutory Chapter 7 trustee fee (the "Chapter 7 Trustee Fee") can be as high as 25% of the first $5,000 disbursed, 10% on any amount disbursed in excess of $5,000 but not in excess of $50,000, 5% on any amount disbursed in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% on any amounts in excess of $1,000,000. Any such Chapter 7 Trustee Fee will directly reduce any recovery for Creditors.

A Chapter 7 trustee will likely also retain Professionals for purposes similar to those retained by the Liquidating Trustee. The Chapter 7 trustee and his or her Professionals, however, may be unfamiliar with Debtor's operations and the Bankruptcy Case. Accordingly, the Chapter 7 trustee and his or her Professionals may be required to devote considerable time reviewing Debtor's books and records and the events of the Bankruptcy Case occurring prior to the conversion to Chapter 7. Given this reality, Debtor and the Committee submit that the fees of a Chapter 7 trustee's Professionals will exceed the fees of the Liquidating Trustee's Professionals.

The rates of those Professionals retained by the Chapter 7 trustee, on the one hand, and the Liquidating Trustee, on the other hand, may vary. For instance, one group of Professionals may have higher rates than a group of other Professionals. Assuming that both groups of Professionals

SL 3303294.1

are equally efficient in their approach and effectiveness in the results obtained, this factor may increase the cost of administration.[5]

Debtor and the Committee believe that the Plan will provide a recovery that is greater than the amount each Creditor would receive under a Chapter 7 liquidation. The Liquidating Trustee will retain Professionals, but given the added expense of the Chapter 7 trustee's Professionals to become generally familiar with Debtor's Estate, the Committee submits that the fees of any Professionals of the Liquidating Trustee should be less than the professional fees of a Chapter 7 trustee. Accordingly, the Plan meets the "best interests" test.

### 3.       Conclusion

For the foregoing reasons, Debtor and the Committee submit that the Plan, as proposed, meets each of the requirements for confirmation under section 1129 of the Bankruptcy Code.

## IX.       TAX CONSEQUENCES

Debtor and the Committee are not qualified to advise Creditors of the specific respective tax impact on each of them as a result of treatment provided in the Plan and therefore make no representation as to that.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CHAPTER 11 CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF A GENERAL UNSECURED CLAIM AS A RESULT OF THE PLAN.

## X.       RISK FACTORS

Holders of Claims against and Interests in Debtor should read and consider carefully the information set forth below, as well as other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as necessarily setting forth the only potential risks involved in connection with the Plan and its implementation.

### A.       Failure To Satisfy Vote Requirement

In the event that sufficient votes accepting the Plan are not received and, as a result, Debtor and the Committee are unable to confirm the Plan as proposed, Debtor and the Committee will assess the alternatives available to it, including: (i) amending the Plan; (ii) converting the Bankruptcy Case to Chapter 7 liquidation proceedings; or (iii) dismissing the case. There is

---

[5]Given that the Professional groups have not been – and, in fact, cannot be – identified at this time, it remains impossible to fully evaluate this issue for purposes of voting on the Plan.

SL 3303294.1

substantial risk that any of these alternatives will result in less favorable treatment of Claims and Interests than that provided in the Plan.

**B.**    **Non-Consensual Confirmation**

In the event an Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at Debtor and the Committee's request if at least one Impaired Class of Claims has accepted the Plan (with such acceptances being determined without including the vote of any "insider" in such Class), and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class(es).  Because the Plan deems Class 3 to have rejected the Plan, these requirements must be satisfied with respect to such Class.  Debtor and the Committee believe that the Plan satisfies these requirements, although there can be no assurances that the Bankruptcy Court will make the findings necessary to reach this result.

**C.**    **Risk of Non-Occurrence of the Effective Date**

Although Debtor and the Committee believe that if the Plan is confirmed, the Effective Date will occur soon after the Confirmation Date of the Plan, there can be no assurance that all conditions to the occurrence of the Effective Date will occur.  In the event the Effective Date does not occur, Debtor and the Committee will assess the alternatives available to them at that time.

**D.**    **Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, Debtor.  The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or interests of such Class.  Debtor and the Committee believe that all Claims and Interests have been appropriately classified in the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Committee believes that the Plan treats each Claim or interest in a given Class equally, thus satisfying this requirement.

To the extent that the Bankruptcy Court finds that the Plan does not satisfy these requirements, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

**E.**    **Amount of Allowed Claims**

The total amount of all Claims filed in the Bankruptcy Case may materially exceed the estimated amounts of Allowed Claims assumed in the development of the Plan and in the valuation estimates provided above.  The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement.  Accordingly, the amount and timing of the distributions that will ultimately be received by any particular holder of an

Allowed Claim in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

In addition, the Liquidating Trust may not have sufficient assets to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims in full in the Bankruptcy Case, including the costs and expenses of pursuing any and all Remaining Actions.

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

Debtor and the Committee believe that the Plan affords holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders.

If, however, the requisite acceptances are not received, or the Plan is not confirmed and/or consummated, the theoretical alternatives include:  (i) formulation of an alternative plan of liquidation; (ii) liquidation of Debtor and the Estate under Chapter 7 of the Bankruptcy Code; or (iii) case dismissal.

### A.    Alternative Plan(s) of Liquidation

If the Plan is not confirmed, the Committee or any other party may attempt to formulate and propose a different plan or plans of liquidation.  Debtor could further erode funds available for distributions to Creditors due to the accumulation of professional fees and costs and other administrative expenses during an extended Chapter 11 process, while a consensual plan of liquidation was formulated and confirmed.

Debtor and the Committee believe that the Plan, as described herein, enables Creditors to realize the greatest possible value under the circumstances and, compared to any other or later alternative plan of liquidation, has the greatest likelihood of being confirmed and consummated.

### B.    Chapter 7 Liquidation of Debtor

If no plan is confirmed, Debtor may be forced to liquidate under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate Debtor's remaining assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or interests in Debtor.

Debtor and the Committee believe that in a liquidation under Chapter 7, before Creditors received any distribution, additional administrative expenses related to the appointment of a trustee and the trustee's attorneys, accountants and other professionals would cause a substantial diminution in the value of the Estate.  The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority over general Creditors whose Claims arose prior to commencement of the within bankruptcy proceedings, and would thus reduce payments to such Creditors.  The liquidation analysis, or "best interests" test, suggests that Creditors could receive significantly reduced distributions on their

SL 3303294.1

Claims in a Chapter 7 liquidation, and payment of such Claims would likely take a significantly longer time to be made.

## XII.  CONCLUSION

Debtor and the Committee submit that under the Plan, holders of Class 2 General Unsecured Claims stand to receive a meaningful recovery on their Claims, while at the same time avoiding the additional fees and expenses that would be incurred upon conversion to Chapter 7. Therefore, Debtor and the Committee believe that the distributions provided for in the Plan are fair and equitable, and Debtor and the Committee strongly recommend acceptance of the Plan.

If you are eligible to vote on the Plan, please do so now by completing and returning the enclosed ballot.

| **THOMPSON COBURN, LLP** | **SPENCER FANE LLP** |
|---|---|
| /s/  Brian Hockett | /s/ Eric C. Peterson |
| Brian Hockett          Mo. Bar No. 52984 | Eric Peterson          Mo. Bar No. 62429 |
| Mark Bossi          Mo. Bar No. 37008 | Ryan Hardy          Mo. Bar No. 62926 |
| One U.S. Bank Plaza, Suite 2700 | Scott Goldstein          Mo. Bar No. 28698 |
| St. Louis, MO  63101 | Zachary Fairlie          Mo. Bar No. 68057 |
| Telephone: (314) 552-6000 | Camber Jones          Mo. Bar No. 71026 |
| mbossi@thompsoncoburn.com | 1 N. Brentwood Blvd., 10th Floor |
| bhockett@thompsoncoburn.com | St. Louis, MO  63105 |
| | Telephone: (314) 863-7733 |
| ATTORNEYS FOR THE OFFICIAL | Facsimile: (314) 862-4656 |
| COMMITTEE OF UNSECURED | epeterson@spencerfane.com |
| CREDITORS | rhardy@spencerfane.com |
| | sgoldstein@spencerfane.com |
| | zfairlie@spencerfane.com |
| | cjones@spencerfane.com |
| | |
| | ATTORNEYS FOR DEBTOR |

SL 3303294.1